Thank you very much. My name is Christopher Jorstad. I'm a California Deputy Attorney General. I represent the respondent in this case, Robert Ayers, who is the warden of San Quentin Prison. Both sides are appealing in this case. Respondent, and I will call myself the State, is appealing the decision of the District Court to grant habeas relief by vacating the death judgment on the basis of its determination that counsel provided ineffective assistance of counsel as required by the Sixth Amendment of the Constitution. By failing to investigate and present certain mitigating evidence. The principal reason why that decision of the District Court must be reversed is that the Court refused to apply the appropriate standard of review. This case is rather odd procedurally in that all of the proceedings leading up to the announcement of the decision by the District Court on the penalty-based issues were conducted under this Court's case law according to pre-reformed standards, that is, according to the law of collateral federal review in effect before the Antiterrorism and Effective Death Penalty Act of 1996. As it happens, on the very same day that the District Court issued its decision on the penalty-based issue, the United States Supreme Court handed down its decision in Woodford v. Garcello. That case converted this case into an AEDMA case. AEDMA required the District Court to forbear from the standard pre-reformed practice of conducting a review as if the District Court were the first repellent court, were the first court to consider what had happened. But you can't turn the clock back. I mean, the hearing had already been conducted. The evidence had been adduced. Is it the State's position that we simply ignore all of the evidence that came in during the District Court evidentiary hearing on the ineffective assistance issue? No, Your Honor. The position is that just as a matter of sheer realism, the Court cannot and should not disregard what happened at the evidentiary hearing, however. So Lady Justice is blind, but we can peek under the blindfold. No, Your Honor. It seems to us that the way that the evidentiary hearing ought to be applied in this case is as a means of testing and verifying the objective reasonableness of what the State Court did, what the District Court failed to do, and what, therefore, no federal court has yet done. Did the District Court issue a supplemental opinion suggesting that it had taken a look at the conclusions in light of the standard? It did, Your Honor. So you're saying that we should ignore that? No. No, Your Honor. Absolutely not. In addition to the statement that you cite, the District Court also said expressly, unmistakably, that in its opinion, the California Supreme Court had failed to adjudicate the merits. What it did was, as I understand it, it exercised its prerogative to summarily reject the petition, although it did initially order the OSC. It then pulled back from that, so there was no evidentiary hearing. And so essentially what we have is a summary denial. The last recent decision in this case was the opinion in the direct appeal. There's no reasoned opinion for us to look at, so what we have to do is take their determination, as I understand it, as their conclusion that as a matter of law and their judgment, as a matter of embedded fact, one can tease out of that, that the petitioner did not state a crime-of-patient case. Didn't even get to the level of requirement of evidentiary hearing. And in that sense, it's a decision on the merits. It's not a procedural ruling that says it's a merits decision. I believe you stated very, very exactly. And you think the District Court misunderstood and somehow said there was no decision at all on the merits. In fact, the District Court said that. But in a merits sense? Yes. The District Court specifically said there was no adjudication on the merits. That was the whole thing of the District Court. And that's the reason why we know. Well, what difference would it make? It makes every difference, Your Honor, because without an adjudication on the merits, there is nothing to defer to. Well, what is it we refer to, then, when it is a summary denial? Don't we look to the implication of the California case law, which says that this means that based on what was alleged and what was attached to the petition, taking it as true, the petitioner has not stated a constitutional claim with ineffective assistance of counsel. And that's what we're looking at. Alice, what else would we defer to? What more are we supposed to defer to, then? I can answer that by alluding to the California Supreme Court's slightly fuller account of its procedural agenda for deciding cases in the summary fashion that you're referring to. Our brief refers to the Duval and the Robbins cases. But there's another one that I think might be helpful to the Court, and that is the Romero case, found in H.L. 3728. And there, the California Supreme Court very carefully explains the reasons why petitioner's submission, that there was no adjudication and that there was only a consideration of the four corners of the petition itself, is wrong. There, the California Supreme Court explained that consideration of the written return, and you're absolutely right, Your Honor, that there was an ORC in this case, and the same filed a formal return, consideration of the written return and matters of record, may persuade the Court that the conventions advanced in the petition lack merit. In this case, and I don't think that it's such an easy call in every case, but in this case, because what we're revealing is ineffective assistance of counsel claims, the Supreme Court has said repeatedly, and this Court has followed suit, that the preferable method of addressing such a claim is to go quickly to the second problem stricken, to prejudice. That is particularly available in this case, because Justice Stanley Moss, as everyone knows, a champion of civil rights. You spent almost eight minutes on the procedural niceties. Yes, sir. And let's get to the facts. Go ahead. Okay. Thank you. I mean, I don't think there's that much disagreement as to what we look at. And the question is, was the thing that was plopped on the desk of the California Supreme Court, with a rebuke broadly in light of Paul's allegation, believing every judgment said it to be true. Yes. Could it have reasonably been rejected? Yes, that's correct. By the California Supreme Court under existing Supreme Court precedent. That's exactly correct. So, now. Get to that. Yeah, well, let me talk about that. That's really what your case is going to stand upon. Yes, indeed it is, Your Honor. Thank you very much. So let's get to that. Yes, I'm delighted to get to that. It allows me to talk about Dr. George Woods. I'm sorry? It allows me to talk about Dr. George Woods and Dr. John Stolberg. In our view, in our view, what was plopped on the desk of the California Supreme Court, in the form of the first state habeas petition, consisted, has to count the penalty case points, of course, consisted of two parts. The first part was state habeas counsel's assemblage of admittedly voluminous evidence having to do with what, as a matter of shorthand, I might choose to call a hard childhood. The second was the attempt of petitioner in his state habeas petition to make something out of that, to interpret it, to give it meaning. And the first petition had Stolberg. Stolberg is the villain. What's extraordinary about this case, Your Honor, is that Stolberg was the... But Stolberg was on and off again, on and off again. I'm trying to figure out where he was at the time of the first petition. He was off the team. He was off the team. That's correct. Stolberg was the original trial psychiatrist. And by the time of the first petition, he is off the team. He's the target, not just off the team. He's the target. I understand. And so they bring in... George Woods. Woods. Correct. Who says grand mal seizure. Grand mal seizure. Not only grand mal seizure. During the time that he was stabbing the two outpost victims, Woods says he was in an epileptic fit as he was stabbing the two victims. And Woods said that he suffered from a bipolar psychosis. It's our view, Your Honor, that the California Supreme Court would have been unreasonable not to lap that on the court. That is palpably absurd. Okay. But let's talk about the South story. Yes. Why would the South story have been enough? I mean, forget about the clumsy psychological implication. The theory is, look, this is a jury. They have family. They have friends. They know what, you know. And here's all this, you know, he's killed. He's not fed. Yes. He's beaten mercilessly. He's got injuries. There's a whole South story. Why wouldn't the South story have been enough? Because the California Supreme Court has seen scores of South stories which were infinitely worse, as has this court. That is the sort of judgment. How about juries, though? It's not what the California Supreme Court has seen. The issue is what the impact is for on this court. It's the impact on the jury. Isn't that the standard? Isn't that what the Supreme Court teaches us? Well, that's what the California Supreme Court was deciding, though. It was. The California Supreme Court. No, the juror hearing it was instead of the mother's account of his childhood, which was relatively benign, had heard that he had been abused, that he had been run over by a car, that he's had head injuries, that his stepfather was abused, all of that South stories, including the hard story, which they didn't have before them. Isn't that the kind of record that the Supreme Court itself has said has an impact on the jury? And in the penalty phase, it's supposed to be unearthed by effective counsel so it can be presented during the penalty phase. I have two responses. The first one is that there's no other reporting case that I'm aware of in which the petitioner himself tells the juror that he has chosen a lifetime. So that may be, but that's the guilt phase. So now the question is what happens in the penalty phase? He's lost on the guilt phase. Now the issue is the U.S. Supreme Court has been quite clear about this. It's two different phases. I'm trying to understand what about the evidence that you're saying. There's plenty of aggravating evidence on the other side. So are you trying to suggest that his own testimony, therefore, is conclusive, that it would make absolutely no difference? Even though he stood up and said, look, I'm a crazy guy. I go out and I've done 200 robberies. Isn't that the whole purpose of bringing out the counter evidence that he's a crazy guy? He may not be, you know, bipolar, schizophrenic or whatever, but this guy has had a bad, bad upbringing. Absolutely not, Your Honor. He never said that he was a crazy guy. In fact, he has spent a quarter of a century insisting in the original court and ever since that he is not crazy. He does not want a penalty phase. He told his counsel don't put on a penalty phase altogether. He's gone through 15 attorneys on collateral abuse. The United States Supreme Court has said that just because the defendant says don't put on a penalty phase, that does not exhaust the obligation per the 1980 ADA standard put on defense counsel to do a proper investigation, present the option to the defendant. And if he wants to say I don't want to put on that kind of defense, there's a different story. But we don't have that here. These guys just didn't do any investigation. I think to return to the takeoff question in this sequence, Your Honor, you alluded several times to decisions of the U.S. Supreme Court post-Edward, as a matter of fact, and I can see that. And there are three important ones. There's Wiggins, there's Ron Pillow, and there's Wiggins. Yes. In all three of those cases, Your Honor, I think it's demonstrably the case that the hard childhood story was vastly more compelling. But the key here, Your Honor, and this is back to I think a suggestion that you're making or a question that you're asking, the key is whether it was objectively unreasonable for the California Supreme Court to say, to determine that a petitioner who has told the jury in the guilt phase, and after all, that testimony is fully admissible. In fact, the VA could have sat down in the penalty phase. A petitioner who said I've done hundreds of robberies successfully. And Justice Stanley Mosk said that he gloried in his criminal disposition. He boasted. He was vain. Now, I think it's objectively unreasonable for a court to say that the evidence of hard childhood that was presented in this case would have outweighed that. Because there is no conceivable connection between the hard childhood and either the murders or, just as importantly, the choice of a life. There are. Conceivable connection. And the deeper question here, Your Honor, is not the sob story or the hard childhood stuff. James Q. Wilson, the extraordinarily persuasive criminologist and legal scholar, wrote an article once called Sorry, I killed you, but I have a hard childhood. A lot of juries don't. He's not the Supreme Court. He certainly is. He certainly is. He thinks he is. Let me, if, I don't want him to feel, but I just want to make sure I am focused on the legal standard. Yes. The phrase is objectively unreasonable. That's correct. In the statute. That's correct. I just want to make sure that what it is that we would have to find the California Supreme Court to have been objectively unreasonable about. So I'm going to talk for a little bit. And when I go off the track, I want you to cut me on this topic. Thank you. No, no. I'll try. No, no. I just want to make sure that we're on the same track. I understand. This is an ineffective assistance of counsel claim. Yes, they all are. I didn't say say anything before that. I say listen. Start talking when I get off track. If I'm on track, you sit there and smile. You can nod if you wish. So this ineffective assistance of counsel claim. Therefore, what the question to be examined is whether the thing that counsel actually did was ineffective at trial. And the attempt to show ineffectiveness is by bringing in other evidence and presenting it to the California Supreme Court. This is a state petition that counsel could have found and could have presented at the penalty phase. And the California Supreme Court looks at the petition, looks at the evidence or affidavits and things attached to the petition, and asks itself the question. Well, that's what we must presume. Assuming that a competent lawyer had brought in this bundle of evidence, the one that we're now presenting, does that show that the quantum of evidence presented at trial was so meager by comparison as to be, as to show ineffectiveness? And so the, if I understand correctly, what we are determining is whether the California Supreme Court was unreasonable in making that determination. In saying that a lawyer who presented this much evidence, or could have presented this much evidence instead, was unreasonable in picking the small part over the big part. Am I understanding correctly? Is that the end of the track you're on? Yes. You certainly are exactly right. If I've gotten this far, well, I simply want to tack on a few things. Go ahead. I have nothing to add to your exposition except for one slight footnote, which is that. I'm scooping them up, that footnote. Actually, I think I'll insert it into the text because it's more important than the footnote. And it is this, that the determination of the California Supreme Court that you are now evaluating comes in two parts. There are two phases. There are two problems. You have identified the first problem. You have correctly stated that what you look at is basically to compare what happened at the trial with what the State petition says might have happened at the trial. That determines deficient performance. That determines whether counsel performed. I'm sorry. If you're going to get to prejudice. Yes, sir. Let me stop you. We're talking about prejudice. And I think what you're going to get to is saying the determination of prejudice is itself reviewed under the high differential standard of reasonableness. Absolutely. Okay. But I wasn't there. Okay. You're not there. I understand. I want to deliver myself to the first half. I realize that prejudice ain't good. You have an argument there. And what I wanted to talk about is a little bit about some of this evidence. Yes. I mean, the lawyer at trial, forgive me. I get this name. I'm just confused. Brainard or something. Brainard and Deadline. That's correct. Yeah. They present one witness. There's a total of maybe ten hours of preparation for the penalty case. I'm in the ballpark, I believe. Yes, that's the allegation. That's correct. Well, that's what we have to defer to, right? Yes. Let me ask. We looked at what was presented to the state court. Yes. We presume it ought to be the possible truth. Correct. So. That's it. Okay. So it's ten hours of preparation for what we believe ought to be the possible truth. Yes. And they bring in the mother, who not only is not particularly helpful, but actually says, you know, this is the only one of my children who went back. He had every chance, just like his brothers and sisters, you know, who became brilliant scientists. Yes. You know, just pillars of community. Whereas, in fact, they're one of the mental hospitals and prisons, but she didn't tell that to the jury. And, you know, he had a great childhood, and I can't believe that he wound up going around killing people when we gave him every chance in the world. So she was not a particularly good mitigation witness. One would say not the best. And then compare it to the mitigation evidence presented in the state's habeas petition. You know, that aunt who came in and told the heartbreaking story about coming down one night and there were the children in the kitchen mixing flour and water because they had nothing to eat, and this is the only way they could suppress their hunger. There were other stories about the mother's behavior, the father's, the stepfather's behavior, the way the petitioner was abused that was quite graphic and quite, you know, humanizing. Yes. In a way that the mother's testimony was on. It's extremely interesting, just in plain old English. Why isn't it ineffective? Why would one reasonably think it was effective to put on the mother and not to put on all these other witnesses to tell the sob story? My first response alludes to a point made earlier by Judge Fisher, which is that this case must be judged in accordance with the controlling federal law as established by the United States Supreme Court. When this case was tried and when this case was brought on state habeas counsel, this court, the United States Supreme Court of Appeals, had not yet begun the development of penalty-based law which started with the Carroll case, and I think there may have been even a mention of the Carroll case as an important seminal development. Carroll was the case in which this court declared that there was a Sixth Amendment duty to, quote, unearth and present evidence of evidence. And in our view... Well, we'll find out what comes to that when the Supreme Court decides that again, right? We certainly will. That's probably right. And I believe Landry was already... Assume they were. Assume their firm was 9-0. Yes. Seem not thinkable. Okay. All right. So it's your presumption that the Supreme Court cases you cited to us, because they didn't come into existence until after this trial, or actually after the trial and after the California Supreme Court decision, that they are irrelevant? No, not the Supreme Court cases, Your Honor, the Ninth Circuit cases. What I'm saying is you don't have to read the district court's opinion very closely to notice that on four occasions the district court, and in his pareration, in the final paragraph, he says the compulsion of the Ninth Circuit cases seems clear. All right. That's fine. You've already identified. It would be very helpful if you focus this on the governing Supreme Court cases, whatever. We're not trying to justify... I understand. In district court's articulation, what we're trying to do is get to the nonlinear case, and I'm trying to understand. You've been very good in going along with Judge Kaczynski's layout, but let's get to where he's got to take it. All right. What is the legal standard against which we judge the objectively reasonable conclusion or unreasonable conclusion in answer to Judge Kaczynski's question? It sounds like you're going to say, gee, it would have been okay at that time because the U.S. Supreme Court hadn't yet clarified what the ABA standards that they invoked meant. So what is your answer? No, Your Honor. I'm sorry. I was not clear at all on that. I wasn't referring to the ADPA standards. I was referring to... I understand. That's correct. I beg your pardon. Yes, of course you're right, Your Honor, and my allusion was not to that. My allusion was to the fact that the California Supreme Court was asked to and did apply Strickland. And in Strickland, in fact, in Strickland, it said that it's not only proper, but it's usual for counsel to define the scope and nature of the investigation in part based on what his client tells him. And that includes, in our view, that the client may say, I don't want anything. Don't put my mother on it. Don't put anyone on it. Could it maybe be a three-word argument? Are you saying that we do not, in assessing what the California Supreme Court did, what the U.S. Supreme Court has said since that time, that the gloss and the definition that they put on Strickland should not be held against the California Supreme Court? No, I'm not. Okay. I'm not saying that. That, in fact, when the Supreme Court issued those three cases, I believe, I'm not sure about the last one, the Supreme Court was reviewing cases that had been tried and appealed before the appellation. Absolutely. And in all three of those cases, the Supreme Court said that there is a duty on the part of the defense counsel to investigate. Yes. And the only investigation we have in this record is 10 hours, the testimony of the mother, and the evaluation by Dr. Stolper. I would like to make very explicit what I'm trying to say. Since he was a vicious killer, he'll do it again. Yes. Basically. Yes. I'd like to make explicit what I think I've only been suggesting, which is that this case was decided by the California Supreme Court on the basis of prejudice, prong two, and should be evaluated by this Court on the basis of prejudice, prong two. So you concede that there was ineffective assistance of counsel under prong one? Your Honor, that word is difficult to swallow, so I can't quite concede. It requires a yes or a no. If the answer is no, then I'll ask another question. I concede that the question is a close one, Your Honor. Yes. And I can – what I suggest, what I'm suggesting – Is that why you've been ducking my question? More than likely, Your Honor. No. I don't – You know, you've got a minute and 36 seconds left, so you have a little choice at this point. But the question I asked you earlier is to stop talking law and talk to me about the facts. Yes. And you neatly answered me by talking about the law and bringing us back into legal statements and things of that sort. The facts that matter here are the bizarre and self-contradictory rotation of expert theories which demonstrate, which conclusively show that there never was a mental defense and conclusively show that the petitioner's attempts to present a mitigating – to have a psychological theory to get mitigation. No. You can't just present a jury and say, look, I had a terrible childhood. I didn't have a lot of chances. Other people did. I was caught up in the closet. People beat me, and I was brutalized. I mean, there are all sorts of these things that happen. All you need is one juror to show up here and say, I can't, in good conscience, force this man to be killed. You know, how do any of us know what we would have done if we'd been treated the way he was treated, like an animal? You know what happens in jury rooms. And that's it. There's no second trial. If the prosecution can't get 12 people to agree on death, it's automatically life in California, right? Yes. So what I've been asking, and I've actually gone about two or three times now, why the sob story itself doesn't carry – why it was not unreasonable for the California Supreme Court to conclude that a lawyer who doesn't dig up – didn't dig up the sob story when it was there, readily in mind, available for anybody to look at, and to present that evidence to a juror and try to get that one juror to show up here, why that was not an unreasonable termination? Because it was a lousy sob story. Because it was weak, unconvincing, and because compared to Ron Pella or Wiggins or Williams, it was – You see, but that's what I'm going to have to get you to tell me why it was so weak. But maybe we'll give you a little time on the bottle. Thank you. You can name that case. So we raise a tear from my eye. Thank you, sir. When you – okay? I appreciate it. We'll hear from the defendant. Good morning, Your Honors. May it please the Court. My name is Sean Kennedy. I'm from the Federal Public Defender's Office. You're a public defender, aren't you? I am a Federal Public Defender. So you're mislabeled when you're telling me. You're labeled AFPB, which was your former connection. Well, I don't think I've seen you on here since you've been elevated. Welcome. It's a pleasure, Your Honor. Nice to make your maiden appearance in front of the Seattle, which I'm sure are really impressed. It is something to be a Federal Public Defender, taking nothing away from the state. It's that you're all looking at careers. You can look at both sides of the equation. Anyway, we won't charge these clueless people time. We'll set the time necessary. Thank you, Your Honor. It is also really something. It's a fair answer. It's also really something to be appointed to represent a person on trial for his life. And a counsel in that situation does not conduct a thorough investigation of mitigation, cannot make reasonable strategy decisions. He gets a psychologist who's pretty well qualified, and he says, you know, I've got bad news for you. Your client is a vicious psychopath, and the only way to keep him from killing again is to execute him. That's basically what his expert told him. Yes. What do you do with that? I mean, you've got to have some sympathy for those two guys. Well, Your Honor, perhaps we would have sympathy for these two lawyers if they had taken their responsibility more heavily, but they didn't. And we know that because Dr. Stahlberg, who was eventually the state's witness in the federal habeas, said he wasn't given the materials that he ordinarily expected, and that when he was given those materials, ordinary mitigation materials, he had a substantially different view of both my client, Mr. Penholster, and the case. He thought, contrary to what Mr. George said. You didn't keep him from being fired a second time, but by you. I understand. I understand. If you were so keen on him after he got the information you wanted, I would have thought you would have put him as part of your case, but you can't. Well, that's true, and I'll take my licks for that. But I would like to say, Your Honor, there's been much made of the changing of witnesses, expert witnesses. But, you know, that happened on both sides of the courtroom in this proceedings. Many of the state's positions in federal court are very different than the positions they took in state court. And I'll just give you a couple of examples. When it went to federal court, the new theory that Mr. Penholster told his lawyer not to pursue mitigation was brought up. That wasn't brought up in the state court. And they brought in Dr. Stahlberg. That wasn't before the California Supreme Court. And I don't fault the state for that because I think they were doing what good lawyers do, which is when you get the hearing that the law requires that you be given, you do your best to win. And that's what happened here. My office did change experts. I can see that. And I'm sure that they did that because they were trying to make the best and most compelling presentation that they could. But the facts that underlie Dr. Vinogradoff's presentation are exactly the same as the facts that were presented through Dr. Woods before the California Supreme Court. But her evidence was not ever put before the California courts. Well, I think much of her evidence was put before the California Supreme Court. Her conclusion was not. Her diagnosis was not. Her diagnosis was not. So what you then get is Dr. Woods, who claims grand mal seizure, which is quite different from what Vinogradoff said. Right? She said, I mean, she had a very different diagnosis. I think, Your Honor, I'm trying to answer your question, that they're not very different. Many of the experts, Dr. Vinogradoff and Dr. Woods, have focused on his head injuries as a young child and those head injuries being related to his epilepsy, which then caused his abnormalities, his abnormal EEG at age 9, and his being prescribed psychotropic medications that are generally related to grand mal and complex partial seizures. And I just want to clarify one thing. It's easy to trivialize the epilepsy. In fact, it was trivialized in the trial court because it wasn't properly known or investigated. It's easy to say, oh, the claim is he's having some kind of seizure and accidentally kills the victim. But I believe that when considered fairly, both Dr. Vinogradoff and Dr. Woods are talking about people with organic brain damage, and that was in the state allegations, caused by epilepsy or manifested by epilepsy as proof of the brain damage, have terrible impacts. You said there was evidence of brain damage in the state courts. What exactly was that evidence? Dr. Woods said that he thought that Mr. Penholzberg had brain damage and a lifelong mood disorder and a seizure disorder, which is another way of talking about epilepsy, which has an organic cause. And it was certainly not explained as fully and as exhaustively as the doctors in the federal evidentiary hearing. But is that theory then also attending the Lisa Tappar incident after the murder, where he stuck a knife through her door and then carved swastikas and lightning bolts on her car? Would that be also explained by a grand mal seizure? Your Honor, I think it is very much related to the damage Mr. Penholzberg suffered as it was manifested by his seizure disorder or epilepsy. Your seizure theory would have to extend over quite a period of time, would it not? Well, perhaps over an entire lifetime or a very long time. So every antisocial act he's committed is the product of a grand mal seizure? Well, not in that way. I don't mean to say that if that's what I'm implying. Well, that's what I'm asking. I mean, are you saying that all 200 robberies and the rectal stabbings and the inmate stabbing at San Quentin and the other double homicide that he may have been involved in, that's all the product of continuing grand mal seizures? Well, it's not the product in the sense that it's an involuntary action, no. But it is the product in the sense that people with prefrontal lobe damage often have seizure disorder and definitely have serious problems regulating their conduct. Would that conduct be consistent with antisocial personality disorder, which is what Dr. Stahlberg originally diagnosed? It may or it may not. But the reason that I say that is it's obvious from our record that different doctors have different views about antisocial disorder, but it's not a magic bullet. Because you have antisocial personality disorder does not mean the penalty phase is over, because as the district judge who actually heard the evidence observed, even if it's true, how does that change the fact that it came to be as the result of social factors upbringing, medical problems, and that they explain and provide a context no matter what diagnosis. This mosque for the California Supreme Court seemed to place heavy emphasis on the fact that Mr. Pinholzer testified in his defense and that the jury had ample opportunity to observe him, particularly when he was gleefully boasting about his long criminal history. Why shouldn't we say he had his opportunity to present himself to the jury and the jury had ample opportunity to evaluate Mr. Pinholzer for who and what he is? The jury, Justice Moss did say that, and the jury had ample opportunity to observe the bad. My concern is that because of the irresponsible approach to the mitigation investigation, and the allegation is 6.5 hours of lawyer time spent, I don't think any investigator time spent, because they were so irresponsible about that, the jury had no opportunity to understand why the bad occurred and that it wasn't just vanity or boastfulness, but in fact it was serious mental health issues coupled with a terrible childhood, and I respectfully disagree with this notion that this is a sob story if that implies that this is not powerful mitigating evidence. It is inconceivable to me that a child... I guess the truth is I looked at the sob story and I wasn't moved. I don't know why it was unreasonable for the California Supreme Court to say, ah, everybody's got a sad story. What we have here is much less than what we've seen in other cases, and even if the lawyers had spent not 6.5 hours, but 650 hours, and had gotten all these witnesses and said everything they said, it wouldn't have made any difference. Make me cry. I understand. What do you have here that's so compelling? We have here, and this is some of the stuff that's highlighted by the hearing and why it's so important, what is portrayed in the trial court as discipline? It ends up being the defendant's stepfather beating him regularly, and sometimes, at least on one occasion, with a two-by-four board in the head. That sounds substantial. We have head injuries where a very young child is going through the window of the car in a bulge, and there's evidence that he is unconscious. That is definitely the type of injury that one associates with frontal lobe damage. We have someone who, at age 9, has a knee injury. There's also evidence, and what the jury would see would not just be one side of the story, but the case experts said, well, there was no injury the first time. The injury was not done over by the car at all. There was no head injury the first time at all. There were two incidents with the car. The second time was very mild, nothing to it. Yes. So that's what they look at. I mean, one doctor would say, oh, this is terrible. There's no evidence of organic brain damage. There's no encephalogram. There's nothing showing shrinkage of the brain at the point of impact. You've got a 9-68 EDG that's somewhat abnormal that can't be replicated. Right? There's no evidence that it was replicated. They say, well, you know, children fall. Children hit their head. Children get beatings, you know, people sometimes. And they turn out okay. Why wouldn't the jury say that? Why couldn't the California Supreme Court say, well, we've seen a lot of these things, and as compared to other sob stories, this is not a very compelling one. We don't think our jurors would fall for it. Your Honor, I would just like to point out that to the extent that the state's expert denied that there was organic brain damage, that wasn't in the state court proceedings. That was new on their side. So the California Supreme Court had only those allegations. I don't think children get beat every day with a board in the head. And a very abnormal EDG at age 9, which is not done in the context of death penalty litigation, is pretty unusual for someone to be committed to a mental state. Well, it's pretty unusual, but it's not replicated. There's nothing to show there's a pattern of this. It could have been an outlier. It could have been a bad test. It could have been a number of things. It's not like showing a history of EDGs. There's nothing. There's no scans showing shrinkage of the brain. You know the kind of stuff they show when there's really brain damage. There's nothing like that here, nothing. There's just a bunch of lawyers, a doctor's fellow, one of whom admits that she was more in the course of death penalty, reaching out and trying to come up with some theories for why this guy had no control. Okay. California Supreme Court says we've seen plenty of these. This one isn't. Even if you just let everything in, everything come in, we've done more, we don't think it's going to make any difference at all. Well, we don't know what the California Supreme Court said. We have to assume it. We have to assume that they reviewed the record, that they believed everything that was presented to it, that they believed that the evidence would have come in just like that, and then it exercised a judgment as to whether or not failure to amass that evidence at a time of trial was both ineffective and prejudicial. And I could just so see Justice Mosk saying, okay. Okay, Your Honor. Tell us what he would say. I'm not sure Justice Mosk should be subject to that. I don't mean to quarrel with the court on this. I mean Justice Mosk. I'm not sure what he would say. I've seen him do that more than once. I don't mean to quarrel with the court. I just bring out that not only is there no hearing, there's absolutely no explanation of reasons, and we know from at least one California case, Nunez v. Mueller, that when the state, my state of California, the state courts say they're applying the prima facie test, they don't necessarily do that because then they question credibility or reject things. And, in fact, the state, while it's arguing the California Supreme Court did that, continues to make arguments that don't accept the allegations as true, that dispute petitioner's allegations. And so I just am concerned that we're assigning a lot of decision-making values that we have no idea if they occurred. But if they did. Go ahead. If they did, it's objectively unreasonable because although, Judge Kaczynski, you weren't impressed, I don't have to show that we would absolutely win. I just have to show a reasonable probability that the outcome would have been different. And this case stacks up, in my opinion, lock, stock, and barrel with Terry Williams, Wiggins, and Rampilla, particularly Williams and Rampilla, where the defendants had very substantial aggravating factors, very substantial prior records, and yet the court found that the idea that they had not suffered prejudice, particularly in Rampilla, was objectively unreasonable. And those were courts who actually held the hearing and listened to the evidence and issued reasons for what they had done. And yet all of those state courts failed. And that is, in my opinion, strong evidence that this is unreasonable, and I don't need to rely on these new Supreme Court opinions. Okay. You can continue to answer, but in focusing on this, the State has said that, understandably, he testified and he bragged about his life of crime and said there was no conceivable connection between his bad history and his life of crime, particularly the murder of his second wife. In the penalty case, his mother did testify. And in judging what the California Supreme Court did, would they assume that he would have testified, and he is assuming yes, would they have to assume that the mother would have been put on? In other words, what is the factors we're supposed to be assuming, and what is the trial penalty case we are assuming would have occurred had there been an investigation? I believe that they have to, the California Supreme Court, have to accept the hypothetical penalty case that would have been put on, had a reasonable investigation. Was there a fact that the mother was testifying? Yes. And that's, I think my question was, with or without? Either way. They had to have assessed it on both the side points? I think a reasonable penalty case investigation would have rendered counsel would be real reluctant to put on a mother if she was going to say what she said, because it was a false and misleading presentation of the life. There is one thing, Your Honor, that I'd like to address. Counsel, what was false? The mother's presentation of Mr. Penholster's upbringing, background, and childhood was false and misleading. His family, he was not the bad seed in a family of good children. All of the children had serious either mental ailments. All we have is counter-analysis at this point. Maybe she was telling the truth. I don't know why. We don't make assessments of who's telling the truth. The question is, there was this additional evidence that they could present from the contrary. That's really the point, whether she's telling the truth or not. Well, perhaps I'm confused, because I thought under this much-reliant-on-theory-of-prime-of-patient-case-summary-denials, you assume that the evidence is true, that Petitioner has proffered. We assume that it's the case for purpose of applying the legal standard, but then when put into motion, all you get is that evidence gets put in the jury. It does not get put in the jury, and the jury is not told that you've got to accept everything these people say as the truth. You still allow the jury to weigh and consider and consider conflicting evidence and see which one they believe. All we really know, had they done what you say they should have done, is the mother would have testified her way. They would have testified something different, and the jury possibly would believe the mother anyway. We don't know. I understand. I mean, I can't work with that. I mean, in the end, it's a reasonable possibility that the fact-finder regarding life or death is the jury. Yes. Well, what was it so different from what she said? You know, so she put a little, I mean, she certainly said that he was abused by the father. She did say, the mother did say, and this is the stepfather, right, not the father who was in the household, the man in the household, that he had lots of violence with his father, and he had a hard childhood. She made all of those comments. And then she sort of, in kind of variety, said, oh, you know, it turned out well. Well, they didn't. Well, I understand, so. Well, I mean, I understand that there's conflicting evidence. Well, I have a little trouble with the construct where the lawyers, if they're going to accept the testimony which they are saying to be true, would have to put on conflicting evidence so that they were impeaching their own witness. But I didn't get an answer to my question about the state's response, which I think deserves an answer, if you can, which is, look, this guy testified. That is something that did happen in the guilt phase. Are you trying to get us to assume that they wouldn't have put him on as a witness or that even though he was on as a witness, in the penalty phase, he could have established some connection? I don't know what your response is to that. It wasn't intentional in any way. No, I know it makes a lot of sense in the real world. Sure. Not at all. There's nothing wrong with that. It's a complicated case. We don't need to assume anything about his testimony. The record was that he testified at guilt phase because his lawyers recommended that he had done it. I know they did. And have they assumed that? Just so the regulators should be able to get to it. I'd still like to know what, because I got a direct answer from counsel for the state. I'd like a direct answer from you. Does the fact of his testimony basically weigh in the balance on prejudice that it did not establish any connections and it did not establish any meaningful connections for the jury given his testimony? All this setting aside, pick out the battle of the experts and just focus on the childhood history. His testimony does weigh in the balance, would be my answer. And it shows why the failure to investigate was so extremely prejudicial, because against the background with which the penalty phase started, there were obviously very negative views of Mr. Penholster. And the whole point of the post-Fuhrman litigation scene is to humanize the defendant and explain his conduct. Although, I would like to point out that when the state argues that we need to show some kind of direct connection between mitigation and the crime, that's just contrary to Supreme Court law. Dredge v. Pinard says mitigation does not have to be causally linked to the crime. But it's a good idea, I'll tell you as someone who's represented people in the trial court for their life, to try to draw connections. And that's what the evidence would have done. And just as an example, Judge, when Mr. Penholster on direct was asked about his epilepsy, that was deemed, that was ruled irrelevant on the objection of the prosecutor. Well, it's not irrelevant at all, because as we learned, people with epilepsy often have a strong reaction, a stronger than usual reaction to drugs and alcohol. We got that from the state's own expert, Mr. Stolberg. And they have terrible impulse control and issues with rage and problems with moral reasoning. If the jury had been explained how and why epilepsy mattered in this case and affected the defendant's conduct on the night of the crime and on the stand in the trial, it may have made a difference. This was a jury that deliberated two and a half days at least on the penalty phase that was given. And it was a very misleading portrayal about the best reasons to spare Mr. Penholster's life. So that said... Was he ever really diagnosed with epilepsy? Was he? In any of the materials submitted in the state court, was he ever diagnosed with epilepsy? He said, diagnosed with epilepsy. I mean, there was evidence of alcohol that he faked. People thought he faked seizures when he was coming here from Buda. And there was some evidence of some seizure drugs as a young man or a younger man. But was there any diagnosis of epilepsy? I'm not able to point to that. I'm only able to point to the prescription of dilantin and mycelinine, which are drugs that are regularly used to treat seizure disorder, and the EEG, which is certainly consistent with epilepsy. But, Your Honor... Why couldn't the state supreme court say, look at that and say, there isn't even a diagnosis of epilepsy? Sure, there are at least two drugs that get taken for that. They'll probably get taken for lots of other things. There is an EEG that's abnormal. It's consistent with epilepsy. It could also be consistent with a malfunctioning wire. And maybe that's not how we'd evaluate it. But why is there not a reasonable way for the state court to evaluate that? We think in the end what the jury would have looked at is the fact that the guy is a vicious killer that calculated carefully a robbery, carried it out methodically, and then when two people happened to walk in to their great misfortune, he stabbed them with their bare hands. He didn't slash away and let the epileptic fit. He went for the heart. He was careful to take out warrants and divide the $23. It shows complete rational thought throughout the process. Why couldn't the state court say, too little, too late? Well, by the time it went to the state supreme court, there was a diagnosis of seizure disorder. The supreme court that denied that. This is Dr. Schwartz? Yes. So when it was there. The guy that got cancer two itinerations back? Yes. It wasn't clear to me that he had a diagnosis like that. He said something about he thought there might have been a seizure, but that was short of a diagnosis of a psychotic. Do you have the declaration handy? I don't, Your Honor. Perhaps the state will. It does refer to seizure disorder, which. But you can see the difference between saying there might have been a seizure and making a diagnosis of seizure, right? I can see that the presentation Dr. Woods gave was not as focused on epilepsy or seizure disorder as the federal one. But it does refer to the defendant suffering from seizure disorder. That sounds like a diagnosis. He says, would have caused me to make further inquiry to determine whether the homicide were related to a mental impact caused by an organic neurological dysfunction. Specifically, I would have recommended a complete battery of neurologic physical examinations, including EG, MRI. Did they even have MRIs in those days? Your Honor. When was the trial? 1984. And I don't think they had MRIs. I don't remember. I don't think they did. And any further studies of the neurologist would have deemed appropriate. The state said that Dr. Woods claimed that he committed the murder in the course of an epileptic seizure. That sounds like, when read as a whole, a diagnosis of seizure disorder, which I believe the doctor said. I see that I'm coming close to the end of my time, and I just want to say one thing. That back in Strickland, which is certainly at the time of the trial, the ABA standards at the time imposed upon counsel a duty to investigate mitigation. So I think the new cases only reveal that this investigation was substandard. And when someone makes a decision about his whole penalty phase based on a factually and legally wrong theory that excuses them from doing any mitigation investigation, and that's what was done here, that's a problem. What do you think would be the effect of Landrigan should we get arrest? I don't think Landrigan, I mean, I think Landrigan as it stands buttresses it. But even if it's reversed per curiam, it wouldn't matter, because that's not the issue here. This is a bread-and-butter Strickland claim before the court. There was no — the investigation was not conducted, and this is by counsel's own admission, because — I don't believe we do, Your Honor. Certainly the court that actually heard the evidence, and it was only the federal court, rejected that assertion. And it's not like Landrigan. Landrigan on the record in the trial court confirms that he is the source of shutting down the mitigation investigation. We have nothing like that here. Counsel said that they did not do a mitigation investigation because they didn't think there was going to be a penalty phase because of a wrong fact, which if they had looked in the prosecutor's files, they would have known was wrong. Also, there was a so-called mitigation presentation. Well, I'm not saying that the client had an argument to it. I understand, although Rompilla talks about you need to investigate aggravating factors. The prosecutor offered her file. In her file is the letter that would reveal that they are factually wrong. And they're not just factually, they're legally wrong. The idea that this notice would have precluded them from putting on the penalty phase is not supported by California law, the failure to give this notice. And so I would just like to point out that they did put on a mitigation presentation without incident for Mr. Penholzberg. And that's because they failed to do a mitigation investigation, and that prompted their strategy, not as in Landrigan, where the client, on the record, told the court he didn't want to do that, and the lawyers honored that. They did put one on. If they were truly reacting in response to their client's directions, why on earth was the letter put on? MR. PENHOLZBERG. Okay. Thank you. MR. BOUTROUS. Thank you, Your Honors. I have a question from the court that's hanging, and I intend to make it the sole point of my rebuttal. I think that running like a red thread through this case is a single figure, a single witness, who, because he was so active in every phase of both the trial and the collateral review, is uniquely qualified to comment on the nature of the mitigating evidence that was so important to the court, that is, characterizing and assessing the mitigating evidence. In fact, it's Dr. John Stahlberg. This is what Dr. John Stahlberg justified to during the evidentiary hearing. When he was asked, you said that you reviewed voluminous material that was presented to the State Court. Would you say, Dr. Stahlberg, that that material was mitigated? Well, what appears to be mitigating is not necessarily seen that way by a vandalized jury, but I'm not supposed to stand in the shoes of the jurors, so it could be. He then was asked by the court, the court interrupted the cross-examination and asked, so, Dr. Stahlberg, what you're saying is, what it would come down to is it's a close question whether this sort of evidence, this hard childhood evidence, should have even been presented, and that it would come down to a matter of judgment from the lawyer. Dr. Stahlberg said, yes. We should pay attention to John Stahlberg's opinion on this. He was an expert for both sides. Unless there are further questions. Thank you, counsel. And may it for all seasons. Thank you, counsel. The case is signed and will stand submitted. We are adjourned.
judges: Kozinski, Fisher, Tallman